**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DENNIS ATIYEH** | : | **CIVIL ACTION NO. 1:26-CV-2813** |
| **Plaintiff,** | : | **(Judge Neary)** |
| **v.** | : | |
| **AL SCHMIDT, in his official capacity as the Secretary of the Commonwealth of Pennsylvania,** | : | |
| **Defendant.** | : | |

**MEMORANDUM**

Dennis Atiyeh, a 2026 independent candidate for governor of Pennsylvania, seeks a preliminary injunction placing his name on the November 3 ballot. Atiyeh argues the Department of State (hereinafter "the Department"), represented here by Secretary of the Commonwealth of Pennsylvania, Al Schmidt, imposed various roadblocks to his inclusion as a candidate on the ballot. Atiyeh therefore asks the court to find violations to his First and Fourteenth Amendment rights under the United States Constitution and order his name listed on the ballot, statewide, as a gubernatorial candidate.

As explained below, Atiyeh has not justified this extraordinary remedy, both because the Purcell principle cautions courts against interfering with elections which, like this one, are imminent, and because he has not met the high standard for a permanent injunction. For all the reasons discussed below, the court will deny Atiyeh's motion.

## I. Factual Background

Dennis Atiyeh decided to run as an independent candidate for governor of Pennsylvania in early 2026. (See H'rg Tr. 36:24-37:1).[1] As an independent, he had to gather 5000 signatures during the nomination period. Const. Party of Pennsylvania v. Aichele, 757 F.3d 347, 351 (3d Cir. 2014). The nomination period ran from March 11, 2026, to August 3, 2026. See Consent Decree, Libertarian Party of Pennsylvania v. Davis, No. 84-0262 (M.D. Pa. June 13, 1984); 25 P.S. § 2603(e). The signatures needed to be obtained on specific forms which the Department makes available on its website and had to be separated by county. (Doc. 13-1 at ECF 15).

Atiyeh alleges the forms were not available online on March 11, as they were supposed to be. (Doc. 1 ¶¶ 4-7). He says he called the Department several times in the month of March to inquire about their availability. (Id.). His first several calls, whose dates he is uncertain of, were fruitless, but he was ultimately able to access the materials during "approximately the final week of March 2026." (Id. at ¶ 8). For its part, the Department insists the online forms were timely available and presents metadata evidence that the forms were uploaded to the Department's website on March 10 at 5:48 p.m. (Doc. 13-1 at ECF 18). The Department also presented evidence of email records showing other candidates were able to access the relevant forms from the Department's website on March 10. (Doc. 13-1 at ECF 15, 20, 22-23).

---

[1] A hearing was held on September 30, 2026. Citations to the September 30 rough hearing transcript are abbreviated as "Hr'g Tr. ___." Pagination of the rough transcript may vary from that of the official transcript.

Atiyeh and his volunteers printed the forms and gathered signatures throughout the summer. (Doc. 1 ¶¶ 11-14). However, they realized sometime in June they were gathering signatures improperly; they had been allowing citizens of various Pennsylvania counties to sign on the same physical form. (Id., ¶ 17). As mentioned above, under the Department's rules, each form may only contain signatures of residents of only one county. (Id., ¶ 16; see also, Exhibit Q at 2). This discovery meant Atiyeh had to start over with less than two months until the deadline.

He was unable to recover from the error, and, on the day of the deadline, having not gathered the requisite 5000 signatures on the proper forms, called into the Department to request an extension. (Doc. 1 ¶¶ 22-23) The employee Atiyeh spoke with told him an extension was impossible. (Id., ¶ 24). Atiyeh then wrote several emails and a letter to the Department, asking them to state their position on extensions in writing. (Id., ¶¶ 25-28). Those emails, which included a threat to take the matter up in the Pennsylvania state courts, went unanswered, and the letter was returned for being sent to an undeliverable address. (Id.; H'rg Tr. 6:18-7:8). Atiyeh averred at the hearing that he was intentionally given the wrong mailing address. (H'rg Tr. 25:20-25:22). Ultimately, Atiyeh did not submit any nomination papers to the Department in support of his candidacy and his name is not currently listed on the November ballot. (H'rg Tr. 38:6-8).

## II. Procedural History and Evidentiary Hearing

On September 21, 2026, Atiyeh initiated these proceedings by way of complaint. (Doc. 1). His complaint was accompanied by a motion for temporary restraining order and preliminary injunction. (Doc. 2). The court denied the

temporary restraining order on the grounds that there was no verified complaint or affidavit attached thereto, nor was there a showing that Atiyeh was likely to succeed on the merits. (Doc. 7). The court held an evidentiary hearing on September 30, 2026. (Doc. 15). Atiyeh testified on his own behalf, and Deputy Secretary for Elections and Commissions for the Department, Jonathan Marks, testified as a witness for the defendant. (Id.)

Atiyeh testified generally about the facts of the case as summarized above. (H'rg Tr., 14:19-52:19). Deputy Secretary Marks testified about the general operation of statewide elections, the distribution of mail-in ballots (both generally and specifically in this election), the trust and accuracy testing performed by all counties, and the logistical hurdles adding Atiyeh to the ballot at this late hour would pose. (H'rg Tr., 54:6-100:8). Following the hearing, the parties declined further briefing. (H'rg Tr. 102:16-25). Therefore, the preliminary injunction is now ripe for decision.

## III. Legal Standards

"A preliminary injunction is an extraordinary remedy granted in limited circumstances. Whether a plaintiff can get one depends on whether (1) he is likely to succeed on the merits, (2) he will suffer irreparable harm without preliminary relief, (3) the balance of equities favors an injunction, and (4) an injunction is in the public interest." Veterans Guardian VA Claim Consulting LLC v. Platkin, 133 F.4th 213, 218 (3d Cir. 2025) (internal citations omitted).

"The first two factors are 'gateway factors': A plaintiff must satisfy them both to be eligible for preliminary relief." Platkin, 133 F.4th at 218 (quoting Reilly v. City of Harrisburg, 858 F.3d 173, 179 (3d Cir. 2017)). "On the first factor, a likelihood of

success on the merits means only a 'reasonable probability' of success—odds that are 'significantly better than negligible but not necessarily more likely than not.'" Id. (quoting Reilly, 858 F.3d at 176, 179). "The standard for irreparable harm is more demanding: The plaintiff must show that it is more likely than not." Id. at 218-19 (citing Reilly, 858 F.3d at 179). "If both gateway factors are satisfied, the court must still weigh all four factors before granting preliminary relief." Id. (citations omitted). The court must then balance all four factors to determine, in its discretion, whether the circumstances favor injunctive relief. Reilly, 858 F.3d at 179.

Where a party seeks mandatory relief through a preliminary injunction, the burden of proof is higher. Mandatory relief is "an extraordinary remedy to be employed only in the most unusual case," where "the moving party's right to relief [is] *indisputably clear*." Trinity Indus. v. Chi. Bridge & Iron Co., 735 F.3d 131, 139 (3d Cir. 2013) (emphasis added).

## IV. Discussion

Atiyeh seeks mandatory relief in this matter. His complaint most clearly states the relief he desires: "order Defendant to take the steps necessary to place Plaintiff's name on the November 3, 2026, General Election ballot [.]" (Doc. 1 at ECF 13). Atiyeh faces a high bar for such relief to issue; as explained above, he must show it is "indisputably clear" that he has the right to mandatory relief. In this context, that means showing he is all but certain to win on the merits. After careful consideration of the allegations and the evidence produced at the evidentiary hearing, the court concludes that Atiyeh has not shown he is likely to prevail on his claims, at least, not to the level of certainty required for the extraordinary remedy of mandatory relief.

### A. The Delay Suggests Relief Should Not Issue

The timing of this suit alone arguably weighs against providing the preliminary relief Atiyeh seeks. The Supreme Court has strongly advised lower courts against interfering with an upcoming election, and the strength of that admonition increases as the date of the election creeps closer. Purcell v. Gonzalez, 549 U.S. 1, 5-6 (2006). That guidepost, often called the "Purcell principle," has been repeatedly and recently affirmed. See e.g., Republican Nat'l Comm. v. Democratic Nat'l Comm., 589 U.S. 423, 425 (2020); Bognet v. Secretary, 980 F.3d 336, 363 (3d Cir. 2020), vacated as moot (affirming district court's denial of a preliminary injunction solely because of timing of plaintiffs' request). Of special instructive value here is Democratic National Committee v. Wisconsin State Legislature, 592 U.S. 1039 (2020). There, the Supreme Court held the district court for the western district of Wisconsin violated the Purcell principle by granting injunctive relief which changed certain deadlines in the 2020 general election in an effort to reduce the spread of the COVID-19 virus. Id. at 1043. Justice Kavanaugh, writing in concurrence, explained the relatively short time between the district court's injunction and the upcoming election should have led the district court to deny injunctive relief. Id. at 1043. The injunction in question was issued on September 21, 2020, 44 days before the general election. Democratic National Committee v. Bostelmann et al., 488 F. Supp. 3d 776 (W.D. Wi. 2020).

Here, Atiyeh waited nearly 50 days—more than half the time between the deadline to submit nomination papers and election day—before filing this lawsuit on September 21, 2026, 44 days before the November 3 election. (Doc. 1). So, any order

of injunctive relief in this matter would have come *later* than the relief the court struck down in Democratic National Committee for being too close to the election.

When faced with the question of delay, Atiyeh explained there were many contributing factors. Those reasons included his consultation with an attorney (who advised him to file in state court, and who Atiyeh ultimately did not employ), an injury he sustained in an automobile accident, and the difficulties of drafting a complaint as a *pro se* plaintiff. (H'rg Tr. 7:9-19; 26:10-14).

While the court is sympathetic to the challenges of litigating *pro se*, and to Atiyeh's further explanation that his campaign takes no donations, the court cannot accord relief on the basis of sympathy where the law does not support it. It is axiomatic that a party who chooses to file *pro se* cannot then be granted relief on the basis of the task of proceeding *pro se* being too tall.

The fact of the matter is we are now less than thirty days from the election, and by virtue of mail-in voting, the election has already begun. Mere days before the preliminary injunction hearing in this matter, the Supreme Court emphasized in another decision that, where an election has already begun via mail-in voting, the "Purcell principle" applies "with even greater force." People Not Politicians v. Onder, 609 U.S. ______ at 2 (2026). That presents a very high bar for Atiyeh to clear.

Out of an abundance of caution, as well as respect for Atiyeh's *pro se* status, the court will stop short of denying his preliminary injunction on the basis of delay alone. Instead, the court considers it as a factor weighing against the granting of

mandatory relief, raising the bar for Atiyeh to obtain relief via preliminary injunction.

**2. Preliminary Injunction - Gateway Factors**

As explained above, four factors govern the appropriateness of granting injunctive relief via a preliminary injunction, but the first two are "gateway factors." Below, the court considers the gateway factors and concludes that Atiyeh has not shown enough to pass through that gateway, and so injunctive relief must be denied.

**a. Success on the merits**

The first gateway factor is a likelihood of success on the merits. Platkin, 133 F.4th at 218. In this matter, success on the merits would be an "indisputably clear" showing that Atiyeh's constitutional rights under the First and Fourteenth Amendments were violated by the laws, polices, and practices of the Commonwealth.

At the outset, the court notes that Atiyeh argues four items *in combination* worked to deprive him of certain constitutional rights. (Doc. 1 at ECF 7). Those items are: not providing the nomination forms on the date they should have been available; the law requiring independent candidates to obtain 5000 signatures for nomination; the policy requiring nomination signatures to be organized by county; and the denial of an extension of his due date for submitting nominating papers. (Id.)

As far as the court can discern, this theory of constitutional violation is novel—Atiyeh does not reference, nor is the court able to locate, any cases where acts by state employees, combined with the operation of certain state statutes or Department policies, created a cognizable constitutional violation. Therefore, the court concludes that Atiyeh has not shown there is a high likelihood of success on this "combination"

theory.[2] This is likely sufficient to show he has no likelihood of success on the merits of his complaint as drafted. However, because Atiyeh is *pro se* and "a document filed *pro se* is to be liberally construed [,]" Erickson v. Pardus, 551 U.S. 89, 94 (2007) (citation modified), the court will consider whether any of these four allegations *individually* identifies a constitutional ground on which Atiyeh is likely to succeed.

**i. Nomination Forms**

Atiyeh avers he called into the Department four times throughout the month of March, 2026, and only on the last call, made sometime in the last week of the month, did the Department inform him the nomination forms were now available on their website. (Doc. 1 at ECF 1-2; H'rg Tr., 38:10-39:16.). Atiyeh estimates he received the papers "approximately 21 days" after the March 11 date on which they were meant to be available. (Doc. 1 at ECF 2). But Atiyeh could not recall specifically what dates he called and admits he "does not go on" the internet (H'rg Tr. 88:10-11), whereas the defendants have submitted evidence which appears to show the forms were available via the Department's web site as early as the evening of March 10, 2026. (Doc. 13-1 at ECF 18, 20, 22-23). In the context of those representations, it is not indisputably clear that Atiyeh will succeed in showing the unavailability of those papers amounted to a violation of his rights.

---

[2] Atiyeh is of course welcome to bring this novel argument in the normal course of the case. But where, as here, the court must estimate the likelihood of success, it is constrained to conclude that a novel theory of constitutional violation backed by no authority does not "indisputably" entitle Atiyeh to his desired relief. See Trinity Indus., 735 F.3d at 139.

**ii. 5000 Signature Requirement**

There is a wealth of precedent supporting the state's ability to create different laws for major and minor parties. See e.g. Rogers v. Corbett, 468 F.3d 188, 195-96 (3d Cir. 2006), In re Zulick, 832 A.2d 572, 581 (Pa. Cmwlth. 2003), Am. Party of Texas v. White, 415 U.S. 767, 781 (1974). Atiyeh does not argue such distinctions are improper. (Doc. 2 at ECF 5). Nor does he present any argument as to why the 5000-signature requirement is, itself, violative of his constitutional rights. He merely points out that he had to gather 5000 signatures, whereas major party candidates are required only to gather 2000 signatures. (Doc. 2 at ECF 9). He did not agree that major party candidates in 2026 were subject to a primary election,[3] and did not address that such candidates may only gather signatures from members of their respective parties, and have a significantly shorter window (three weeks, compared to almost five months for minor party candidates) to gather signatures. 25 P.S. §§ 2862, 2911(c), 2913(b). Suffice it to say that without providing a meaningful legal argument, it is not indisputably clear that Atiyeh will be successful on these grounds.

**iii. One County Per Page**

The Department alleges the "one county per page" rule controlling the signatures on nominating papers protects important legal interests of the

[3] Atiyeh argued at the hearing that there was no primary election for major party candidates in this election cycle, implying the lack thereof obliviated this proffered justification for the different standards. (Hr'g Tr. 3:24-25, 43:21-25, 44:23-45:2). This argument is without basis in fact. The court takes judicial notice of the fact that the Commonwealth held primary elections on May 19, 2026. (Pennsylvania Elections, 2026, BallotPedia, https://ballotpedia.org/Pennsylvania_elections,_2026 (last visited October 6, 2026)).

Commonwealth, averring this requirement assists in the Department's examination of nomination papers and the objection proceedings which follow a submission of nomination papers. (Docs. 13 at 21-22, 13-1 at ECF 15). Atiyeh presents no legal argument on this practice's unconstitutionality, stating only "the practical burden imposed by this requirement" combined with his other complaints to reduce his effective circulation period, which he presents as a violation of his constitutional rights. (Doc. 2 at ECF 8). But identifying a "practical burden" does not amount to a strong likelihood of success in showing application of this rule results in a constitutional violation.

**iv. Extension Denied**

Finally, Atiyeh believes he was wronged by the lack of an extension to his time to complete nomination papers, but he does not identify any reason he was entitled to an extension. While he claims delay in accessing the nomination papers and implies this delay should have been compensated by an extension commensurate with that delay, Atiyeh's own conceptualization of fairness is not enough to demonstrate entitlement to relief. First, as already discussed, it is not clear on this record that any delay in access to the forms in question occurred, much less that it was attributable to fault by the defendant. Further, even assuming *arguendo* delay did occur and was the Department's fault, it does not automatically follow that such delay entitles Atiyeh to an extension, and he identifies no authority by which such an extension should have issued. It cannot be that a state agency enforcing a deadline, without more, is a violation of Atiyeh's constitutional rights. Moreover, Deputy Secretary Marks attested that no Department employee had the authority to issue such an

extension, and argues that even if they did, doing so would "result in unequal treatment among third-party candidates" which would itself likely be a violation of the Fourteenth Amendment rights of other candidates. (Doc. 13-1 at ECF 15; H'rg Tr. 105:13-15). The court concludes Atiyeh has not shown an indisputable likelihood of success on claim.

**b. Plaintiff's Irreparable Harm**

There is little room for debate on the second gateway factor: the movant's risk of irreparable harm if the injunction is denied. It is apparent that Atiyeh would suffer irreparable harm if he does not obtain his desired injunctive relief. Denial means Atiyeh would not appear on the ballot anywhere in the state, meaning his only route to the Governor's office would be pursuing a write-in candidacy. The court therefore concludes that this factor favors Atiyeh. But victory on this factor is not sufficient to accord Atiyeh relief, as he must satisfy *both* gateway factors for his claim to survive. Platkin 133 F.4th at 218.

In sum, based on the evidence and arguments currently before the court, Atiyeh has not shown he is likely to succeed on the merits of this petition, and certainly not to the high level required to obtain mandatory relief in the face of the Purcell principle. The court, therefore, need go no further: Atiyeh's claims do not make it past the initial gateway, and injunctive relief will be denied.

**3. Conclusion**

As we have explained, injunctive relief generally requires a strong likelihood of success. Here, given the Purcell principle and Atiyeh's request for mandatory relief, he needed to show *more* than the average movant to be granted his desired injunction,

something approaching certainty that his claims would be meritorious. Atiyeh has not produced sufficient evidence to clear that hurdle, and so injunctive relief must be denied.

An appropriate order follows.

/S/ KELI M. NEARY
Keli M. Neary
United States District Judge
Middle District of Pennsylvania

Dated: 10 October, 2026.